I'd like to reserve two minutes for rebuttal. May it please the Court, my name is Jonathan Montag and I represent Amira Mohamed and her son Farag Abdallah. The immigration judge in this case stated that there was no guidance that he had about a statute in the Immigration Act at 1158 regarding the issue of identity and the requirements for the capturing of biometrics. It looks like a case has come out since then but we didn't get a 28J letter from you. I was going to address that, Your Honor. Is that Coloma? It's Coloma v. Gonzalez and that came out on January 15th of this year. And I believe that that case is completely dispositive of the issues in this case. In that case, the wording of the immigration judge is very close to the wording in this case and that's because my research shows me that it was the same immigration judge who had the theory in both of the cases that that statute meant that if the respondent could not prove her identity to the court then she, by a matter of law, fails to be able to prove she's an asylum. Well, now we know that's wrong. But on the other hand, the court didn't have the guidance of that particular case at the time so the court was trying to cobble those things together. So now we know that that's the standard. So that means that the immigration judge was wrong at the time even though he didn't know it and no one's saying that he was being dishonest or disingenuous. Well, he couldn't have known it because there wasn't a case out there. But the question is did it permeate, I guess. And when I read the immigration judge's decision, it seems to me that just like in the Kaluma case there's a constant refrain throughout the decision that because this woman can't prove her identity we already have problems with her credibility and then everything else that he finds is kind of gilds that lily which he refers back to two or three times in his decision. There's language in Kaluma, in the revised amended Kaluma in order to make it consistent with our case in Farrah v. Ashcroft which says identity is something that the petitioner has to establish and it says the I.J. gave no reason for finding this identification insufficient or incredible except for the misread statute. But in this case the I.J. gave a number of reasons for finding the identification insufficient and talks about the identification or the question of identity not having been presented and that goes to the heart of the silent claim. Doesn't that distinguish Kaluma from this case? I don't believe so because in Kaluma the immigration judge also found other reasons to doubt credibility. And in my case he referred to the person as saying he's from the Sudan but not being able to prove it and then found other inconsistencies to bolster his initial conclusion and I think in this case the same thing happened where he starts off saying she's a self-proclaimed Ethiopian woman and then finds other consistencies to build on that. But I think the basic issue for them, the same judge in these two cases is because he's not satisfied with an identity which he finds from the statute, from his initial reading of the statute, then he just finds other things to compound that. So you're saying that when you have something that to quote permeates the entire determination that a fresh look has to be taken to see whether independently of identity there is or is not the required proof. Is that essential? Yes, Your Honor. And I think that's what Kaluma teaches and there's been other cases. When I discovered this case recently in preparation then this Court has other cases where they find the same thing and I can certainly 28-J them to the Court. There's Lopez-Umanzur v. Gonzalez which is from 2005 where once there's a problem in the factual determinations and that permeates the rest of the decisions then there's a due process problem and the case needs to be returned so that it can be ironed out. So even though the immigration judge finds some inconsistencies when there is this permeating problem where he's obviously preoccupied with identity and I think that you can tell the immigration judge finds that now he has a way to simply dispose of the case. Now if we were to buy that, does that, I know that, I haven't looked at Ninth Circuit case law, I must confess on this, but I do. I'm familiar with a lot of Seventh Circuit law in the precincts from which I come in and it's recognized, at least in our circuit, that you cannot direct that something go back to a different immigration judge but you can strongly suggest that. Now I don't know, is it your position that if we were to accept your argument that it would simply be sent back for a determination by the same immigration judge? Well, my reading of the case of the circuit in immigration, which was my major preoccupation in life, regrettably, is that this court can recommend it and I haven't seen them actually direct it. Not order but recommend. Yeah, and I think in your circuit, the case that I read, sometimes they tell the lower court. The other thing though, the immigration judge did not have the benefit of cologne either and so, I mean, that happens to all people that have been trial judges. They do the best that they can under the circumstances but then if a case comes down, whether you agree with it or not, but tells you how to resolve something, I'm going to say that 99% of the judges are going to, 99.9 even, are going to follow that precedent if it's out there. I mean, it's a different thing when you're saying that someone really wasn't unfair, that they were unfair, but here the judge didn't have the benefit of it. And I'm sorry to interrupt. It's just that I don't want it to be in any way implied. I was making as a preface that that's my understanding of the difference in the circuits. However, the immigration judge, Judge Bartholomew, I think is an honorable and fair immigration judge and I think that he had a- Because you will probably be back in front of that person. Yes, that's an issue. No, all joking aside, it need not be. But I think that he had a principled view of the meaning of the statute and that's why he took the position that he took. And I don't think that he was prejudiced against her for any other reason except how he read the statute. Now, that all being said, the other issues in the case were questions about what language he spoke and I think it was a complete muddle as to which language she spoke best. It's not clear to me why they chose an Italian interpreter at the airport in Atlanta. It doesn't seem to me from the record that they called an Italian interpreter because she requested one. And it could just as well be that there happened to have been an Italian interpreter at the airport at the time. She said she knew Italian and it was an easy match because at her trial, she spoke Amharic and it seems to me if they were searching for the proper interpreter, it would have been an Amharic one. And then other things, she didn't know the meaning of the letters O-L-F which is the Oromo Liberation Front in English but she wasn't an English speaker. I didn't know it was English because I thought the whole thing was through an interpreter. Well, the issue was those three letters. I think she got two-thirds of the way through, didn't she? Yes, that's right. And if it's 10% for an asylum case, then that's pretty good. But all joking aside, O-L-F was what they were asking for. Do you know what these letters mean? And as if they were asking her, do you know what A-M or P-M is and she was supposed to know what these mean. Now in her own language, there's probably a different... I know they don't call it O-L-F. They have a Oromo or an Amharic word for it. Do you mind if we reserve your time? You have a minute and a half. I will. Thank you. May it please the Court. Zoe Heller on behalf of the Attorney General. This case involves a native of Ethiopia who entered the United States from Italy. In this case, the immigration judge found Ms. Mohamed to be incredible. In particular to her identity, but also with respect to how, and I'll quote the immigration judge, has not presented credible evidence regarding her identity for the particulars of her claim. It is not simply the case, and as Your Honor pointed out, this case was briefed and the immigration judge issued his decision prior to the Kaluma case. And again, if that is briefed before this Court in a 28-day, we would respond to that. But the immigration judge... Shouldn't you have both just called that to the Court's attention? Yeah, the obligation does call to... I don't think the government is... It would have been nice if either of you had, but fortunately we found it. Correct, Your Honor. Both parties could have brought this to the Court's attention. But again, here it's not... I don't see it fully dispositive of the issue, in that the immigration judge also found Ms. Mohamed incredible with respect to the elements of her claim in how that pertains to her identity. And contrary to what the counsel said, her identity and the issues he found necessarily with the statute in that her burden to prove her identity did not permeate the immigration judge's decision. Well, Ms. Howard, isn't what permeate connotes the notion that that defines sort of the perspective that the deciding judge brings to the case? And if that's the perspective that the presiding judge brings to the case, doesn't the notion of permeation suggest that that somehow casts a cloud or some question as to what the case would be without that, where there's so much emphasis on identity, which is, I think, what counsel is saying. We'll send it back so that it can be done independently of this notion of identity being a controlling component. Well, the fact that, as counsel argued, that he probably had the identity glasses on, so to speak, when he was issuing his decision, you know, at times you see, and especially in this case as well, the immigration judges can make alternative findings. They can take those glasses off. They can look at different components. Well, you can, but it really bothers you if you don't know who someone is. I mean, this is the woman that, you know, she uses a passport that I think then when she gets called on at the airport, she says it's not hers. But, in fact, it was. Well, then it turns out, well, yeah, then I think then evidence comes in, and, hey, these are valid passports, and it's her. But then, I don't know, who is she really? And, I mean, obviously I would like people to be concerned about who's coming into our country. And then, you know, and then other things come up that, you know, okay, she's off when her parents were murdered. Now, you could say a month isn't that big a deal. But then the other side of it, you could say, I mean, I know people that have had tragic things happen in their lives, and every year on that date that is the focus of their, you know, you don't forget when someone calls you and says, well, both of your parents were murdered, that, you know, there's that argument to be made. But it all still sort of comes back to, I mean, who is this woman? And then she claims that, you know, that she's, maybe she was in Italy longer. Maybe she's someone else, and she speaks this Italian, and then she doesn't speak this language. I mean, who is she? Yes, identity was the main focus. And, again, it corresponded to how she was able to establish her claims. Because if she was not Ms. Mohamed, who was from Ethiopia, then how did this alleged persecution happen? How did her parents die? So she had this Farah case, which says identity is important  And then we have this Kaluma case saying that this 1158D is wrong. You know, this analysis that there's a heightened burden of proof. How do you make these two cases consistent? Well, I would. And how did they apply to this case here? Would reconcile the two, if I could. Unfortunately, there's no case that has sort of put them both together. By saying that it's still, obviously, the burden is on the alien to, you know, credibly establish her claim for asylum. So now focusing on the credible determination that it is her burden to put forth enough evidence to establish her identity. So it's almost taking apart that heightened standard and putting the burden solely on the alien to, say, come forth with all this documentation. But nonetheless, the immigration judge and the agency is entitled to make it an adverse credibility finding in assessing whether or not the alien has met the burden, albeit not that heightened burden of establishing who she, in fact, was. How can we tell if the IJ here was imposing a heightened burden, which under KLUMA is incorrect, or just the burden that's correctly applied under FERA? Well, in viewing the immigration judge's decision here, there is no indication that he put this, quote, unquote, this heightened burden. The immigration judge went through, you know, the six factors that he really relied on in making that just an adverse credibility determination in finding that she was not credible in establishing who she was, and again, and how that relates to establishing, you know, her claim on her merits, her allegation that her parents were killed because of their affiliation with the OLF, which she was unable to, again, state what those OLF stood for. She was also unable to- If you recall the part of the record now, of course, we have the disadvantage that it was being given in some other language, and what we have is the English version. But my recollection of the way that went is that she started to give an answer, and her answer had gotten an explanation of the O and the L, and then she got interrupted, and she could not, you're right, explain it in the precise terms of the English language version. But isn't that an awfully tough one, when we don't know what the corresponding information was in terms of the question as related to her in Italian and came back? Well, again, when she was initially interviewed at the airport, the assessment of her claim went through various stages before it reaches the immigration judge. You know, she was initially interviewed, you know, at the airport, and then, in fact, said through the Italian interpreter what she indicated. She didn't have a problem understanding and relaying her story. She did mention O-L-F, and, in fact, you can note the notations made by the asylum officer. On her own asylum application, she does say O-L-F, and her testimony during the hearing was a Romo community organization or something like that. She was also- She gave something that, as I remember, I don't have it before me, but, as I recall, it was an O and it was an L, two words that had that. But then, as she had given that, she was interrupted in part of her response and didn't get the opportunity completed, and then it got converted to this thing that you're talking about. Well, she definitely got the O right. It would be a little bit like if I asked everyone if they could tell me what does Herrera stand for or if I went, you know, and that doesn't- If you couldn't do all of that, I'm not going to send you out of court and say you don't know what you're talking about in this case, because, I mean, we have- In all of these cases, we have all of these things, and we know what we're looking at, but could we always say- And then I hear people say Ira-Ira or Rera. You know, I don't know. How do we say that? Welcome to my world. But it was not just the fact that she couldn't relate what O-L-F stood for. Again, there were multiple factors that the immigration judge relied on here. She could not recount who was the countering party to O-L-F, which she alleges was responsible for the murder of her parents in either November or December of 2000, whichever version you want to believe. She also could not credibly establish where she was when her parents were allegedly murdered. At various points in the testimony, she says she was with her parents when that occurred. Then she was with an uncle in the town of Jima, and I'm sorry if I'm pronouncing it wrong, and then again with an uncle in a town called Skia, and then back again to being with an uncle in Jima. So, again, there are multiple factors. It's not just solely rested on the fact that she couldn't recount what O-L-F stood for. She also couldn't recount what the flag looked like, this motto that she said that she saw every single day upon entering her house. She could not give an accurate description of that flag. She could also not give an accurate description of her hometown of Jima, in fact saying that there was only a population of 300 people when, in fact, the evidence submitted into the record is plenty more than just 300 people. So, again, there were multiple factors here that went into the immigration judge's adverse credibility. In fact, you know, going to establishing who she was and as well as to the merits of her claim clearly go to the heart of her asylum claim, and we believe that substantial evidence in this record supports the immigration judge's decision and that there's no record evidence compelling a different result, and for that reason we request that this Court deny the petition for review. Thank you. When the immigration judge made his decision, he said that because of this problem of identity and credibility that he was going to deny asylum. But he, as far as the withholding of removal, is when he made a more specific decision about her eligibility outside of the credibility issue, saying that he didn't see it was more likely than not. But he never said that it wasn't more likely, that there wasn't a probability of persecution for asylum other than because of this complex issue of identity and credibility. All the other issues regarding the credibility, like the flag, again, the record also shows there were several flags for the country and it was never really determined what the inconsistency about what she said, and I think if somebody were to give me, for example, a crayon and ask me to draw the California flag, it wouldn't look very much like the actual California flag. And the same goes for the mixing up of the birth date, which was obviously August 2nd and February 8th, which the immigration judge made a lot to do with. And I think you can definitely find that by combining his findings with the fact that he was preoccupied with the statute, that the case probably needs to go back for him to be able to sort it out without that preconception. All right, thank you for your argument. This matter will stand submitted. All right, on Covarrubias. All right, Sarah Diaz, Covarrubias v. Michael McKaysey, case number 0670447. Thank you. Good morning.
judges: Callahan, Ikuta, Shadur